MATTHEW J. MCKEOWN
Acting Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice
Washington, D.C. 20530

THOMAS BOER
Trial Attorney
Environment and Natural Resources Division
United States Department of Justice
301 Howard Street, Suite 1050
San Francisco, California 94105
Telephone: (415) 744-6471
Facsimile: (415) 744-6476

STEVEN W. MYHRE
Acting United States Attorney
BLAINE WELSH (Bar No. 4790)
Assistant United States Attorney
District of Nevada
333 South Las Vegas Blvd., Suite 5000
Las Vegas, NV 89101
Telephone: (702) 388-6336

Attorneys for Plaintiff United States of America

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>and<br><br>NEVADA DIVISION OF ENVIRONMENTAL PROTECTION,<br><br>          Plaintiffs,<br><br>v.<br><br>NEVADA POWER COMPANY,<br><br>          Defendant. | Case No. _____ |

# TABLE OF CONTENTS

Page

I.    JURISDICTION AND VENUE .................................................................................. 2
II.   APPLICABILITY ........................................................................................................ 2
III.  DEFINITIONS ............................................................................................................. 3
IV.  CIVIL PENALTY ....................................................................................................... 6
V.   COMPLIANCE REQUIREMENTS ............................................................................ 8
VI.  ENVIRONMENTAL MANAGEMENT AND AUDITING........................................ 9
VII.  ENVIRONMENTAL PROJECTS ............................................................................. 11
VIII. REPORTING REQUIREMENTS .............................................................................. 15
IX.  STIPULATED PENALTIES ...................................................................................... 17
X.   FORCE MAJEURE .................................................................................................... 23
XI.  DISPUTE RESOLUTION .......................................................................................... 24
XII.  PERMITS .................................................................................................................... 27
XIII. INFORMATION COLLECTION AND RETENTION .............................................. 28
XIV. EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS ................................... 30
XV.  COSTS ........................................................................................................................ 31
XVI. NOTICES .................................................................................................................... 31
XVII. EFFECTIVE DATE ................................................................................................... 33
XVIII. RETENTION OF JURISDICTION .......................................................................... 33
XIX. MODIFICATION ....................................................................................................... 33
XX.  TERMINATION AS TO COMPLETED TASKS ..................................................... 34
XXI. PUBLIC PARTICIPATION ....................................................................................... 34
XXII. SIGNATORIES/SERVICE........................................................................................ 34
XXIII. INTEGRATION ........................................................................................................ 35
XXIV. FINAL JUDGMENT ................................................................................................ 35
XXV. APPENDICES ........................................................................................................... 35

# **CONSENT DECREE**

Concurrently with the lodging of this Consent Decree, Plaintiffs United States of America, on behalf of the United States Environmental Protection Agency ("EPA"), and State of Nevada, on behalf of the Nevada Department of Conservation and Natural Resources, Nevada Division of Environmental Protection ("NDEP"), have filed a Complaint in this action pursuant to Sections 113 and 304, respectively, of the Clean Air Act (the "Act"), 42 U.S.C. §§ 7413 and 7604, alleging that Defendant Nevada Power Company ("Defendant" or "NPC") violated the Act at its Reid Gardner Generating Station coal-fired power plant located near Moapa, Nevada (the "Facility").

The Complaint alleges that NPC regularly exceeded the twenty percent opacity limit and the associated record keeping and reporting requirements at all four coal-fired electric generating units ("EGU's") at the Facility, in violation of the Nevada Administrative Code § 445.721 of the SIP. Moreover, the Complaint alleges that NPC violated the monitoring, record keeping, and reporting requirements of its Operating Permit, and as set forth in the fifty-six Notices of Alleged Violation issued by NDEP (Docket Numbers 1862 through 1907 and 1942 through 1951) and a Notice of Violation issued by EPA R9-06-10.

NPC denies any liability to the United States or the State of Nevada arising out of the transactions or occurrences alleged in the Complaint, and maintains that it has been and remains in compliance with all applicable statutes, regulations and permits and is not liable for civil penalties and injunctive relief as alleged in the Complaint.

The Parties recognize, and the Court by entering this Consent Decree finds, that this Consent Decree has been negotiated by the Parties in good faith and will avoid litigation between the Parties, and that this Consent Decree is fair, reasonable, and in the public interest.

NOW, THEREFORE, before the taking of any testimony, without the adjudication or admission of any issue of fact or law except as provided in Section I below, and with the consent of the Parties, IT IS HEREBY ADJUDGED, ORDERED, AND DECREED as follows:

## I. JURISDICTION AND VENUE

1. This Court has jurisdiction over the subject matter of this action, pursuant to 28 U.S.C. §§ 1331, 1345, and 1355, and Section 113(b) of the Act, 42 U.S.C. § 7413(b), and over the Parties. Venue lies in this District pursuant to 42 U.S.C. § 7413(b), and 28 U.S.C. §§ 1391(b) and (c) and 1395(a), because the violations alleged in the Complaint occurred in, and NPC conducts business in, this judicial District. Solely for purposes of entering and enforcing this Decree under the terms herein, NPC consents to the Court's jurisdiction and venue in this judicial District.

2. Solely for purposes of entering and enforcing this Consent Decree under the terms herein, NPC agrees that the Complaint states claims upon which relief may be granted pursuant to Section 113(b) of the Act.

3. Notice of the commencement of this action has been given to the State of Nevada, as required by Section 113(b) of the Act.

4. On December 2, 2004, and July 19, 2005, NDEP issued a total of fifty-six Notices of Alleged Violation to NPC, consisting of docket numbers 1862 through 1907 and 1942 through 1951.

5. EPA issued a Notice of Violation to NPC, docket number R9-06-10, dated June 21, 2006.

## II. APPLICABILITY

6. The obligations of this Consent Decree apply to and are binding upon the United States, the State of Nevada, and upon NPC and its successors or assigns.

7. Any transfer of ownership or operation of the Facility to any other person must be conditioned upon the transferee's agreement: (i) to subject itself to the jurisdiction of this Court as the defendant in this Consent Decree, and (ii) to perform all remaining obligations of NPC required by this Decree, as provided in a written agreement between NPC and the proposed transferee, enforceable by the United States and/or State of Nevada as third-party beneficiaries of such agreement. At least 30 days prior to such transfer, NPC shall provide a copy of this Consent Decree to the proposed transferee. At least 15 days prior to such transfer, NPC shall provide

written notice of the prospective transfer, together with a copy of the proposed written agreement, to the Plaintiffs, pursuant to Section XV (Notices) of this Decree. If NPC attempts to transfer ownership or operation of the Facility without complying with this Paragraph, it shall constitute a violation of this Paragraph. NPC shall remain obligated to ensure that the terms of the Decree are implemented until: (i) Defendant has paid the civil penalty as required by Section IV (Civil Penalty); (ii) with respect to operations by NPC prior to transfer of ownership or operation of the Facility, Defendant has either paid any accrued stipulated penalties owed to the United States and State of Nevada pursuant to Section IX (Stipulated Penalties) or any disputes relating to stipulated penalties have been resolved pursuant to Section XI (Dispute Resolution); and (iii) the transferee is substituted by the Court as a defendant under this Decree.

8. NPC shall provide a copy of this Consent Decree to all officers and employees whose primary duties include compliance with any provision of this Decree, as well as to any entity retained to perform on-site compliance requirements found in Section V of this Consent Decree. NPC shall include the provisions of Appendix A in any such contract.

9. In any action to enforce this Consent Decree, NPC shall not raise as a defense the failure by any of its officers, directors, employees, agents, or contractors to take any actions necessary to comply with the provisions of this Consent Decree.

### III. DEFINITIONS

10. Terms used in this Consent Decree that are defined in the Act or in regulations promulgated pursuant to the Act shall have the meanings assigned to them in the Act or such regulations, unless otherwise provided in this Decree. Whenever the terms set forth below are used in this Consent Decree, the following definitions shall apply:

    a. "2006 dollars" shall mean the value of a cost incurred, or benefit accrued, in future years, converted to 2006 dollars using the Consumer Price Index. This value shall be calculated using the following equation, where 20XX is the year in which the money is expended by the NPC, or the benefit is accrued, and "CPI" is the Consumer Price Index, as reported by the United States Bureau of Labor Statistics:

2006 CPI

- 3 -

1   $\frac{\text{-----------}}{\text{20XX CPI}}$   X   cost incurred (or benefit accrued) in year 20XX = "2006 Dollars"

   b. "Baghouse" shall mean a pollution control device designed to reduce emissions of particulate matter from the Facility's boiler exhaust through the use of filter bags;

   c. "CCDAQM" shall mean the Clark County Department of Air Quality Management, located in Clark County, Nevada;

   d. "CCSD" shall mean the Clark County School District, located in Clark County, Nevada;

   e. "Commence Construction" is defined in 40 C.F.R. § 51.165(a)(1)(xvi);

   f. "Complaint" shall mean the Complaint filed by the United States and State of Nevada in this action;

   g. "Consent Decree" or "Decree" shall mean this Decree and Appendices A - C attached hereto;

   h. "Day" shall mean a calendar day unless expressly stated to be a working day. In computing any period of time under this Consent Decree, where the last day would fall on a Saturday, Sunday, or federal holiday, the period shall run until the close of business of the next working day;

   i. "Defendant" shall mean Nevada Power Company;

   j. "ERC" shall mean Emission Reduction Credit;

   k. "EGU" shall mean an electric generating unit at the Facility;

   l. "EPA" shall mean the United States Environmental Protection Agency and any of its successor departments or agencies;

   m. "Facility" shall mean NPC's Reid Gardner Generating Station located near Moapa, Nevada;

   n. "Integrated Resource Plan" shall mean the same as that term is defined in NAC § 704.9156;

   o. "NDEP" shall mean the Nevada Division of Environmental Protection, located in Carson City, Nevada;

1    p. "Opacity Compliance Period" shall begin upon the Effective Date of this
2 Decree and terminate thirty-six months after the Effective Date of this Decree, or upon the date
3 the baghouses for Units 1-3 begin operation pursuant to Paragraph 16, or upon decommissioning
4 of Units 1-3, pursuant to Paragraph 16(b), whichever is sooner.
5    q. "Opacity Exceedance" shall mean any 6 minute block opacity average as
6 determined by the continuous opacity monitors (COMS) for Units 1-4, which is greater than 20
7 percent, except those exceedances which are exempted due to water vapor interference from
8 uncombined water, as provided for by the SIP, NAC § 445B.22017(2);
9    r. "Operating Permit" shall mean the Facility's Class I Air Quality Operating
10 Permit No. AP4911-0897, required for operation of the Facility under Title V of the Clean Air
11 Act, 42 U.S.C. §§ 7661-7661f, and is the same permit required pursuant to Title 40 Nevada
12 Revised Statutes Chapter 445B, et seq.;
13    s. "Plaintiffs" shall mean the United States and the State of Nevada;
14    t. "PUCN" shall mean the Public Utilities Commission of Nevada;
15    u. "Nevada" or "State of Nevada" shall mean the State of Nevada on behalf of
16 the Department of Conservation and Natural Resources, Division of Environmental Protection;
17    v. "$NO_x$" shall mean the sum of oxides of nitrogen in the flue gas, collectively
18 expressed as $NO_2$;
19    w. "Paragraph" shall mean a portion of this Decree identified by an Arabic
20 numeral;
21    x. "Parties" shall mean the United States, State of Nevada and Defendant;
22    y. "ROFA Project" shall mean NPC's installation of a rotating opposed-fire
23 air system in Unit 4. The ROFA Project is being undertaken by NPC for reasons other than
24 compliance with the Operating Permit and is not otherwise required by law.
25    z. "Section" shall mean a portion of this Decree identified by a Roman
26 numeral;
27    aa. "SIP" shall mean the Nevada State Implementation Plan, approved by EPA
28 pursuant to section 110 of the Clean Air Act;

- 5 -

bb. "$SO_2$" shall mean sulfur dioxide;

cc. "Unit #1" shall mean the existing 1965 Foster Wheeler Carolina type, natural circulation, wet bottom, eight-burner front-fired, pulverized coal, positive draft, 110 megawatt steam generator at the Facility;

dd. "Unit #2" shall mean the existing 1968 Foster Wheeler Carolina type, natural circulation, wet bottom, eight-burner front-fired, pulverized coal, positive draft, 110 megawatt steam generator at the Facility;

ee. "Unit #3," shall mean the existing 1976 Foster Wheeler Carolina type, natural circulation, wet bottom, eight-burner front-fired, pulverized coal, balanced draft, 110 megawatt steam generator at the Facility;

ff. "Unit #4" shall mean the existing 1983 Foster Wheeler Carolina Type, natural circulation, wet bottom, sixteen-burner front-fired pulverized coal, negative draft, 295 megawatt steam generator at the Facility;

gg. "United States" shall mean the United States of America, acting on behalf of EPA.

## IV. CIVIL PENALTY

11. Within 10 business days after NPC receives notice from the United States that this Consent Decree has been lodged, NPC shall deposit the sum of $1,110,000 as a civil penalty into an escrow account bearing interest on commercially reasonable terms, in a federally charted bank (the "Escrow Account"). If the Consent Decree is not entered by the Court, and the time for any appeal of that decision has run or if the Court's denial of entry is upheld on appeal, the money placed in the Escrow Account, together with the accrued interest thereon, shall be returned to the NPC. If the Consent Decree is entered by the Court, NPC shall, within 10 business days after NPC receives notice from the United States thereof, cause the money placed in the Escrow Account, together with accrued interest thereon, to be paid to the United States and NDEP, as a civil penalty, as follows:

a. Payment of $340,000.00, plus 30% of accrued interest shall be made by FedWire Electronic Funds Transfer ("EFT") to the U.S. Department of Justice in accordance with

instructions to be provided to NPC by the Financial Litigation Unit of the U.S. Attorney's Office for the District of Nevada. At the time of payment, NPC shall simultaneously send written notice of payment and a copy of any transmittal documentation (which should reference DOJ case number 90-5-2-1-08653 and the civil action number of this case) to the United States in accordance with Section XVI (Notices) of this Decree.

        b.      Payment of $770,000.00, plus 70% of accrued shall be made by cashier's check, made payable to the "State of Nevada – Account for Management of Air Quality," and sent via registered, certified or overnight mail to:

>  Mike Elges
>  Chief, Bureau of Air Pollution Control
>  Nevada Division of Environmental Protection
>  901 S. Stewart Street, Suite 4001
>  Carson City, NV 89701

At the time of payment, NPC shall simultaneously send written notice of payment and a copy of any transmittal documentation to the State of Nevada in accordance with Section XVI (Notices) of this Decree.

    12.    If the NPC fails to make timely payment to the United States of the civil penalty set forth in Section IV. Paragraph 11(a), above, it shall be liable to the United States for interest on the late payment as provided for at 28 U.S.C. § 1961. If NPC fails to make timely payment to the State of Nevada of the civil penalty set forth in Section IV. Paragraph 11(b), above, it shall be liable to Nevada for interest on the late payment at the same rate as required by 28 U.S.C. § 1961. If NPC fails to make timely payment to either of the Plaintiffs, it shall also be liable for stipulated penalties, as set forth in Section IX (Stipulated Penalties).

    13.    Any payment made pursuant to Section IV (Civil Penalty) of this Consent Decree is a penalty within the meaning of Section 162(f) of the Internal Revenue Code, 26 U.S.C. § 162(f), and is not a tax deductible expenditure for purposes of federal, state, or local law. Neither NPC nor any of its parent or affiliated corporations shall deduct NPC's payment of the civil penalty provided for herein for any tax purpose or otherwise obtain favorable tax treatment of such civil penalty payment.

## V. COMPLIANCE REQUIREMENTS

14. In order to prevent opacity emission violations, as well as other violations at the Facility as identified in the Complaint, NPC shall comply with the requirements of this Section.

15. <u>Igniter Installation Project</u>. NPC shall replace the fuel oil igniters for Units 1-4 at the Facility by installing natural gas igniters in Units 1-4; replace the Burner Management System for Units 1-4 as necessary to operate natural gas igniters; construct a natural gas pipeline connecting the Facility to the Kern River Natural Gas Pipeline; and undertake any other modifications at the Facility necessary to operate natural gas igniters in Units 1-4.

    a. NPC shall complete construction of the Igniter Installation Project required by this Paragraph no later than twenty-four months (24) after the Effective Date of this Decree. Beginning twenty-four (24) months after the Effective Date of this Decree NPC shall not use oil for start-up or flame stabilization of any EGU at the facility.

16. <u>Installation and Operation of Baghouses</u>. By no later than thirty-six (36) months after the Effective Date of this Decree NPC shall complete construction and begin operating three separate Baghouses at the Facility, for Units 1, 2, and 3, respectively.

    a. If construction of any one of the three Baghouses is not completed by within thirty-six (36) months after the Effective Date of this Decree NPC may, in its discretion, shut down and cease the operation of any one of the Units not operating a Baghouse at the Facility. NPC may, at its discretion, recommence operation of a Unit shutdown pursuant to this paragraph, provided that construction of a baghouse for the Unit is complete and the baghouse is operational.

    b. If NPC does not receive approval from the PUCN for the installation and operation of the Baghouses for Units 1-3 in its Integrated Resource Plan, NPC may, in its sole discretion, choose to decommission Units 1-3. If NPC chooses to decommission Units 1-3 pursuant to this Paragraph, the following shall apply:

        i. NPC shall notify the EPA and NDEP in writing, pursuant to Section XVI (Notices), that it intends to decommission Units 1-3 no later than November 30, 2007, or

within one year of the PUCN decision on NPC's Integrated Resource Plan, whichever is sooner; and

        ii.    NPC shall shut down and permanently cease operation of Units 1-3 on or before November 30, 2008.

17.    <u>Monitoring, Recordkeeping, and Reporting</u>.  NPC shall comply with the monitoring, recordkeeping, and reporting requirements set forth in the Operating Permit.

        VI.    <u>ENVIRONMENTAL MANAGEMENT AND AUDITING</u>

18.    NPC shall implement an Environmental Compliance Plan at the Facility, and conduct audits in accordance with the Plan at the Facility, as further specified in this Section. Violations disclosed in the audits required by Section VI shall be deemed to meet the "voluntary discovery" condition of EPA's policy entitled "Incentives for Self-Policing: Discovery, Disclosure, Correction and Prevention of Violations" (65 Fed. Reg. 19,618, April 11, 2000).

19.    <u>Implementation of Environmental Compliance Plan</u>.  No later than 10 days after the Effective Date of this Decree, NPC shall implement the Environmental Compliance Plan, attached in Appendix B, at the Facility, setting forth policies, procedures, and controls to assure ongoing compliance with its Operating Permit and any other applicable requirements pursuant to the Act and SIP.

    a.    The Environmental Compliance Plan required by Paragraph 18, and attached in Appendix B, shall be materially modified after consultation and agreement between the Parties.  A material modification does not include changes in NPC personnel, outside contractors used by NPC or software systems described in the Environmental Compliance Plan. If a modification to the Environmental Compliance Plan is agreed upon by all of the Parties, NPC shall provide a copy of the modified Plan to NDEP and EPA, as required pursuant to Section XVI (Notices).

20.    <u>Title V Air Quality Operating Permit Audits</u>.  No later than 6 months after the Effective Date of this Decree, NPC shall complete its initial audit of its compliance with its Title V Air Quality Operating Permit, as specified in Section 14 of its Environmental Compliance Plan, attached in Appendix B.  This initial audit will be the first of a series of four Title V compliance

audits conducted at the Facility. Each one of the four audits will focus only on one of the following aspects of the Operating Permit and the associated state and federal regulations: (1) monitoring, reporting and record-keeping; (2) continuous emission monitoring system (CEMS) and continuance opacity monitoring system (COMS) operation, maintenance and software; (3) emission exceedances; and, (4) an internal audit of overall environmental compliance management. All four of these audits shall be completed within 18 months after the Effective Date of this Decree. The audits shall be memorialized by final written reports provided to EPA and NDEP within 10 days of completion of each audit.

  a. NPC shall select a third-party auditor to conduct the audits required by this Paragraph, with the exception of the overall environmental compliance management audit, which will be done internally. The third-party auditors shall: (i) have expertise and competence in the applicable environmental requirements; (ii) the lead auditor shall have at least attained a bachelor's degree at an accredited institution; (iii) not be an employee or former employee of NPC, nor its parent or affiliated corporations; (iv) not own any stock in NPC, or in any parent or affiliated corporations, nor have a financial stake in the outcome of the audits required under this Section of the Decree; and (v) be capable of exercising independent judgment and discipline. If NPC, or any parent or affiliated corporation, has had a previous contractual relationship with the auditor selected under this Paragraph, NPC shall disclose to EPA and NDEP, pursuant to Section XVI (Notices), the nature of the previous contractual relationships.

  b. Within 90 days of the Effective Date of this Decree, NPC shall submit, in writing, to EPA and NDEP, pursuant to Section XVI (Notices): (i) the name, affiliation, and address of the auditors selected by NPC to conduct the audits required by this Section; and (ii) documentation demonstrating that the auditors satisfy the requirements of Paragraph 20(a). If the Plaintiffs determine that the proposed auditor does not meet the qualifications set forth in Paragraph 20(a), or that a past or existing relationship with the auditor would affect the auditor's ability to exercise the independent judgment and discipline required to conduct the audit, the Plaintiffs reserve the right to disapprove of the auditor within 25 days after EPA and NDEP have both received the notice of the proposed auditor from NPC pursuant to this Paragraph, and

1  another auditor shall be proposed by NPC for approval within 30 days of NPC's receipt of the
2  disapproval.

3     c. If, at any time, NPC wishes to hire a new auditor, NPC shall notify the
4  EPA and NDEP in writing, pursuant to Section XVI (Notices), with an explanation for the
5  change. Any subsequent auditor must satisfy the qualification requirements of Paragraph 20(a).
6  The procedural requirements in Paragraph 20(b) shall apply to the selection of a new auditor.

7    21. Each submission required under this Section shall be signed by an official with
8  knowledge of the auditing process at the Facility and shall bear the certification language set forth
9  in Paragraph 40, below. Any submission made by NPC will not be complete for purposes of
10 meeting the deadlines specified by this Section, unless it meets the requirements of this
11 Paragraph.

12       VII. ENVIRONMENTAL PROJECTS

13   22. <u>NOx Emission Reduction Credit Donation Project</u>. No later than six months after
14 the Effective Date of this Decree, NPC shall apply to CCAQMD for NOx ERCs associated with
15 the ROFA Project. NPC shall reduce any application to CCAQMD for NOx ERCs generated by
16 the ROFA Project by 282 tons per year of NOx ERCs, or 30 percent, whichever is greater, of the
17 decrease in NOx emissions to be achieved by the ROFA Project calculated using a two year
18 average baseline, consisting of Unit 4 NOx acid rain data from a period between 2001 and 2005,
19 pursuant to CCAQMD regulations. This reduction shall not be used by NPC in any other
20 application for ERCs, or for netting or determining contemporaneous decreases for New Source
21 Review (NSR) and/or Prevention of Significant Deterioration (PSD) Program purposes. NPC's
22 ROFA Project is for reasons other than compliance with the Operating Permit.

23    a. Within ten days of submitting any NOx ERC application to CCDAQM,
24 NPC shall provide a copy of the application to EPA and NDEP, pursuant to Section XVI
25 (Notices) of this Consent Decree.

26    b. If the ROFA Project does not achieve a NOx reduction of at least 282 tons
27 per year on or before two years after the Effective Date of this Decree, NPC shall pay to the
28 United States, pursuant to Paragraph 54, an amount determined by the following formula:

1       (280 – [Actual NOx Reduction in tons per year achieved by ROFA Project]) × $10,639

2   23.  **SO$_2$ Limitations and Operating Permit Modification.**

3       a.  Beginning on the Effective Date of this Decree, measured separately, Units 1, 2 and 3 shall not have SO$_2$ emissions in excess of .40 LB/MMBtu, based on a 10 day rolling average period.

6       b.  Compliance with the SO$_2$ emission limitations in this Paragraph shall be demonstrated with SO$_2$ CEMS and the procedures established in the appropriate section of NPC's Operating Permit.

9       c.  In accord with Section XII (Permits), NPC shall modify its Operating Permit to include the SO$_2$ emissions limitations required by this Paragraph.

11  24.  **Energy Savings Project for Clark County School District.**  NPC shall perform projects for the Clark County School District that will result in reducing the amount of energy consumed by CCSD's facilities. These projects will result in a quantifiable and verifiable annual energy bill savings of over $500,000, and cumulative energy bill savings in excess of $4 million, in 2006 Dollars, to CCSD no later than seven years after the Effective Date of this Decree.

16  25.  **Clark County School District Energy Savings Project Completion Report.**  No later than July 30, 2014, Defendant shall submit a Completion Report to NDEP, pursuant to Section XVI (Notices). The Completion Report shall contain the information required below, in Paragraph 25 (a)-(f). NPC shall use reasonable efforts to collect any information from third-parties, including CCSD, necessary for the Completion Report.

21      a.  a detailed description of the CCSD Energy Savings Project as implemented since the Effective Date of the Decree;

23      b.  a description of any problems encountered in completing the CCSD Energy Project and the solutions thereto;

25      c.  a detailed analysis of the energy savings achieved by the project, presented both in terms of (i) avoided Kwhs and/or decatherms of natural gas, and (ii) cost savings, cumulatively and annually, to the CCSD in 2006 Dollars. This analysis will reference the following measurement and verification protocols: International Performance Measurement and

- 12 -

Verification Protocol; the Measurement and Verification Guidelines for Federal Energy Projects (Federal Energy Management Program, U.S. Department of Energy); and the American Society of Heating, Refrigerating and Air-Conditioning Engineers, Inc. (ASHRAE) Guidelines on Measuring Energy and Demand Savings;

      d.    a detailed analysis of CCSD's projected energy annual energy savings in 2006 Dollars expected due to the project, using the following measurement and verification protocols: International Performance Measurement and Verification Protocol; the Measurement and Verification Guidelines for Federal Energy Projects; and the ASHRAE Guidelines on Measuring Energy and Demand Savings;

      e.    certification that the CCSD Energy Savings Project has been fully implemented pursuant to the provisions of this Decree, and has resulted in both cumulative cost savings and projected annual cost savings to CCSD, required by Paragraph 24; and

      f.    a description of the environmental and public health benefits resulting from implementation of the project (with a quantification of the benefits and pollutant reductions, if feasible).

26. Within 30 days of its receipt of the Completion Report pursuant to Paragraph 25, NDEP may request additional information from NPC, in addition to that described in Paragraph 25, if necessary to determine the adequacy of the completion of the CCSD Energy Savings Project and/or to evaluate the economic benefit of the project to CCSD. NPC shall respond to a request from NDEP pursuant to this Paragraph within 90 days, and shall use reasonable efforts to collect any information necessary to respond to NDEP's inquiry.

27. If the project has not been satisfactorily completed in accordance with the requirements of this Consent Decree, or if the cumulative and annual energy savings realized by CCSD as a result of NPC's project are less than the amounts required by Paragraph 24, above, the State of Nevada may assess Stipulated Penalties pursuant to Paragraph 50.

28. With regard to the environmental projects required by this Section, NPC certifies the truth and accuracy, to its knowledge, of each of the following:

1        a.      that all cost information provided to the Plaintiffs in connection with the Plaintiffs' approval of the environmental projects in this Decree is complete and accurate and represents a fair estimate of the costs necessary to implement the projects;

        b.      that, as of the date of executing this Decree, NPC is not required to perform or develop the environmental projects by any federal, State, or local law or regulation and is not required to perform or develop the projects by agreement, grant, or as injunctive relief awarded in any other action in any forum;

        c.      that NPC has not received, and is not negotiating to receive, credit for the environmental projects in any other enforcement action; and

        d.      that NPC may finance and pay for the environmental projects as allowed under Nevada law as a regulated utility, but will not receive any reimbursement for any portion of the environmental projects from any unrelated third-party, governmental grant, foundation or charitable organization.

29.     Disputes concerning the satisfactory performance of the environmental projects required by this Section may be resolved under Section XI (Dispute Resolution) of this Decree.

30.     Each submission required under this Section shall be signed by an official with knowledge of the environmental project and shall bear the certification language set forth in Paragraph 40, below.

31.     Any official public statement, oral or written, in print, film, or other media, made by NPC, or its parent or affiliated corporations, making reference to the environmental projects required under this Section shall include the following language: "This project was required by the terms of a Consent Decree entered into with the State of Nevada and the U.S. Environmental Protection."

32.     Neither NPC nor any of its parent or affiliated corporations shall deduct the costs associated with the environmental projects required by this Section for any tax purpose, or otherwise obtain favorable tax treatment of such costs.